# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH C. OUTLAW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 08 C 4729** |
| | ) | |
| MICHAEL ASTRUE, | ) | **Magistrate Judge Sidney I. Schenkier** |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

In this social security appeal, the plaintiff, Joseph C. Outlaw, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c), seeks summary reversal and/or remand of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The Commissioner has filed a cross-motion seeking affirmance of the ALJ's decision denying benefits. For the following reasons, Mr. Outlaw's motion for reversal and/or remand is denied (doc. # 22), and the Commissioner's motion to affirm (doc. # 31) is granted.

### I.

We begin with a summary of the procedural history of this case. On April 29, 2004, Mr. Outlaw applied for SSI and DIB, stating that he was unable to work due to his disabling conditions since the alleged onset date of January 1, 2003 (R. 66). His application was denied on December 3, 2004 (R. 50-54). Upon reconsideration, Mr. Outlaw's application was again rejected on April 13, 2005 (R. 56-60).

---

[1] On May 11, 2009, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 13, 24).

Mr. Outlaw then requested and was granted a hearing before an Administrative Law Judge ("ALJ") (R. 61-63, 1623). On December 7, 2006, Mr. Outlaw appeared *pro se* at the scheduled hearing, but the hearing was postponed due to a delay in obtaining Mr. Outlaw's medical records (R. 1623-39). On May 8, 2007, Mr. Outlaw, represented by counsel, appeared for his rescheduled hearing before a second ALJ (R. 1640-82). Mr. Outlaw and a Vocational Expert ("VE") testified at this hearing (*id.*). On June 27, 2007, the ALJ issued a written decision denying Mr. Outlaw's application for DIB and SSI benefits, holding that Mr. Outlaw did not meet his burden of proving that he was disabled under the meaning of the Social Security Act (R. 9-19).

On August 22, 2007, Mr. Outlaw filed a request with the Appeals Council for review of the ALJ's decision (R. 8). On June 16, 2008, the Appeals Council rejected Mr. Outlaw's request for review of the ALJ's decision, finding that the additional evidence he supplied did not provide a basis for changing the ALJ's decision (R. 4-7). When the Appeals Council declines to review an ALJ's decision, the ALJ's decision constitutes the final decision of the Commissioner. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

On August 20, 2008, Mr. Outlaw initiated the present civil action for review of the Commissioner's final decision.

## II.

We now turn to a summary of the administrative record. The vast majority of the 1600-plus page record in this case consists of progress notes, medical records, consultation requests, and health summaries from the many visits Mr. Outlaw had with medical doctors, nurses, and psychiatrists at the Edward Hines VA hospital since the alleged onset date of his disability on January 1, 2003. We address Mr. Outlaw's complaints and the treatment of his physical ailments, mental ailments, and

2

drug dependency issues separately in Section A, review the administrative hearing in Section B, and then address the ALJ's written opinion in Section C.

## A.

Mr. Outlaw was born on March 17, 1958 (R. 66). He is 5'8" and weighs approximately 256 pounds (R.1645). He completed high school and two years of college (R. 110, 1646). Mr. Outlaw was in the United States Air Force for approximately one year before being discharged for a personality disorder in 1980 (R. 197, 1645-46). He has been divorced twice and is currently living with his third wife (R. 66-67, 1645). According to his employment records, Mr. Outlaw has worked in a number of manual labor jobs, including as a warehouse worker and maintenance worker (R. 92).

### 1.

Mr. Outlaw's physical ailments revolve primarily around his back pain. In his November 2003 visit to the VA hospital, he complained of back and hip pain (R. 272). The notes from that visit described him as ambulatory, and he refused to use a walker or a cane (R. 272-73). His physical examination reported paraspinal tenderness, but the straight leg test was negative and there was no point tenderness on his hip (R. 271). Images of his lumbosacral spine showed mild scoliosis, mild spondylosis, and a slight narrowing at certain disc spaces (R. 143). Mr. Outlaw was diagnosed with chronic joint pain (R. 271). On January 5, 2004, Mr. Outlaw returned to the VA hospital complaining of intense, chronic pain in his hip, moderate lower back pain, and nagging shoulder pain (R. 251). However, no functional problem was identified (R. 251). Mr. Outlaw was ambulatory, and he indicated that he walked frequently and prepared his own meals (R. 255).

On March 9, 2004, Mr. Outlaw went to the hospital complaining of chronic lower back pain and sexual dysfunction, which may or may not have been related to his complaints of back pain (R.

3

197, 203-04). He was assessed with minimal lumbar spondylosis and a slight narrowing of L4-S1 (R. 204). The doctor found a paraspinal muscle spasm at L5-S1, but no spinal tenderness (R. 204). The medical records show that Mr. Outlaw was advised to quit smoking or chewing tobacco, and to exercise, stretch, and strengthen his core (R. 204-05). Mr. Outlaw was referred to a dietician, who educated him on nutrition and told him to limit his intake to 1,800 calories per day (R. 205-09). He was scheduled to attend a weight management class, but he did not attend it (R. 170).

On March 31, 2004, Mr. Outlaw continued to complain of pain, and the attending physician recommended back rehabilitation (R. 183). Mr. Outlaw, however, became irate and stated that he "wants RX for pain pills only" (*id.*). With his complaints of lower back pain continuing, Mr. Outlaw continued his visits to the VA hospital. Between April 14 and April 26, 2004, he was diagnosed with right L5-S1 radiculopathy and minimal disc bulge at L5-S1, but an MRI of Mr. Outlaw's lumbar spine showed that alignment of his spine was normal, conus medullaris was normal, and there was no vertebral collapse or focal disc protrusion (R. 168, 172-73). An anesthesia nerve block consultation also found that Mr. Outlaw's spine was normal and that he had no focal disc protrusion (R. 396). On June 22, 2004, an EMG found no electrophysiological evidence of lumbar radiculopathy, and on July 13, 2004, an MRI showed minimal disease (R. 348, 378).

In addition to back pain, Mr. Outlaw complained of and was treated for several other physical ailments. On April 14, 2004, Mr. Outlaw was diagnosed with plantar fibromatosis (R. 176). He was fitted and refitted with shoe inserts several times to help with the pain, and eventually he had surgery on his feet to remove the fibromas on August 5, 2005 (R. 163, 176, 327, 488). On May 14, 2004, Mr. Outlaw complained of swelling and pain in his knee, and the doctor recommended Mr. Outlaw elevate and ice behind his knee (R. 164). Three days later, Mr. Outlaw was diagnosed with a chip

4

fracture of the right medial malleolus, in the ankle region (R. 164). He was issued crutches but refused to use them or wear a splint; on June 24, 2004, Mr. Outlaw was prescribed a cane to assist in walking, and at one point he was issued a walker (R. 150, 157). Mr. Outlaw has also been diagnosed with probable bilateral carpal tunnel syndrome ("CTS"). In July 2003, he was given splints to wear on his wrists at night, but no surgery was recommended for the condition (R. 144, 278-79).

On August 10, 2004, Mr. Outlaw was examined by internal medicine physician, Margaret Stronska, at the request of the Social Security Administration (R. 452). Dr. Stronska observed that Mr. Outlaw was able to dress, undress, bend, get on and off the examining table and chair, ambulate 50 feet without assistance, squat and arise from a squatting position, heel and toe walk, and tandem walk (R. 454). He did not use a cane (R. 456). She found no musculoskeletal problems and determined that Mr. Outlaw had full motion and strength in his shoulders, elbows, wrists, and hands (R. 454-55). Dr. Stronska also found that he had full strength in his hips, knees, and ankles (R. 455). He had no muscle spasms and could perform full extension of the lumbar spine, but with pain (R. 455). Straight leg raises were negative from both the supine and sitting position (R. 455). Dr. Stronska found no sensory deficits from the CTS (R. 175, 403, 456). On September 14, 2004, state agency physician Dr. Anjimand Towfiq interpreted the results of Dr. Stronska's examination to be that Mr. Outlaw's physical impairments were non-severe, singly and in combination (R. 475).

From August through October 2004, Mr. Outlaw returned to the VA hospital multiple times complaining of pain (R. 346-47). He was prescribed pain medication, and on September 21, 2004, Mr. Outlaw received a lumbar paraspinal muscle trigger point injection for his pain (R. 343-44). During those visits, physical findings at the location of the pain were normal (R. 338-39, 345-47).

5

Although Mr. Outlaw was tender in the lower back lumbar and lower sacral area, tests were negative, and his pain could not be reproduced with passive movement (R. 335).

At various times throughout 2005 and 2006, Mr. Outlaw returned to the VA hospital with complaints of chronic back pain, but no different diagnoses were made (*see, e.g.*, R. 1282). In May 2005, the examining resident opined that Mr. Outlaw's complaints of pain did not match the MRI taken in April 2004 (R. 930). The doctor recommended physical therapy, but Mr. Outlaw refused; when the doctor refused to prescribe narcotic pain medication, Mr. Outlaw "escalated" and left the clinic (*id.*).

In 2007, Mr. Outlaw complained of pain in his hands, shoulders, knees, feet, and back (R. 1283). A January 2007 image of his lumbosacral spine showed mild degenerative disc disease (R. 1289). The attending doctor prescribed Vicodin and an anti-inflammatory (R. 1282-86). Mr. Outlaw was also counseled on weight management to help with his pain (*id.*). In April 2007, Mr. Outlaw repeated his complaints of pain, but declined epidural injections (R. 1251). At that time (one month before the administrative hearing), Mr. Outlaw walked without assistance and had full motor strength (*id.*). That doctor also recommended weight loss to help with his back pain (R. 1250). On April 29, 2007, Mr. Outlaw was diagnosed with edema, and the doctor opined that his excessive weight could be the cause (R. 1255-61). On May 3, 2007, in his last doctor visit before the administrative hearing, the doctor noted moderate restriction in Mr. Outlaw's range of motion in his lumbar spine, but otherwise normal readings, including a negative straight leg test (R. 1270-71).

## 2.

In addition to his physical ailments, Mr. Outlaw has battled drug dependency throughout his life. He claimed to use heroin or cocaine as a way to self-treat his back and other pains, but some

6

medical professionals questioned whether his claims of pain were a way for him to justify his drug use (*see, e.g.*, R. 183, 269, 930). He was directed to attend a drug treatment program, but notes in his file from the VA hospital indicate that he failed to attend from January through June 2003 (R. 280-83). On August 19, 2003, Mr. Outlaw's addiction therapist indicated that he sought increased medication, had continued to use heroin and cocaine, and had not committed himself to the treatment program (R. 277). On October 1, 2003, Mr. Outlaw was removed from the drug treatment program for failing to comply with the requirements (R. 273-74).

Mr. Outlaw's cocaine and heroin use continued in January 2004 (R. 260). He indicated that heroin and pain medications help relieve his pain (R. 248). On May 24, 2004, Mr. Outlaw claimed that he had not used heroin in months (R. 160), but by September 2004, we was using heroin again (R. 334). During the next two years, medical professionals at the VA hospital continued to note Mr. Outlaw's drug dependency issues. Mr. Outlaw tested positive for cocaine as late as December 2006, but he claimed to have been drug-free for the year preceding his hearing before the ALJ on May 8, 2007 (R. 1293, 1652, 1656).

### 3.

Throughout 2004, Mr. Outlaw also went to the VA hospital complaining of psychological and emotional problems including depression, suicidal ideation, anxiety, inability to concentrate, and trouble getting along with others (*see, e.g.*, R. 134, 156, 200, 1248). In January 2004, Mr. Outlaw was admitted to a psychiatric unit for four days, and was diagnosed with substance-induced depression (R. 216-46). Upon discharge, he was prescribed anti-depressant medication (R. 225-26).

In March 2004, Mr. Outlaw was diagnosed with polysubstance dependence and given a provisional diagnosis of major depressive disorder (R. 202). However, he was not referred to a

7

psychiatrist at that time because he had not regularly taken his anti-depressant medication, and his pain complaints predominated over the depressive symptoms (*id.*). In May 2004, he was again diagnosed with polysubstance dependence (in remission) and antisocial traits (R. 161). Mr. Outlaw received individual psychotherapy at the hospital throughout that year (*see, e.g.*, R. 377, 380, 614).

On August 10, 2004, Dr. Stronska opined that Mr. Outlaw appeared to not have a depressive disorder or cognitive difficulties, but she reported that Mr. Outlaw was placed on Prozac by a psychiatrist for depression (R. 455-56). On August 27, 2004, a state reviewing psychiatrist, Dr. Galassi-Hudspeth, opined that Mr. Outlaw was mildly limited in his activities of daily living and moderately limited in maintaining social functioning and concentration, persistence, or pace (R. 471). He diagnosed Mr. Outlaw with a personality disorder, substance abuse, and a substance-related mood disorder, but noted that he was in remission (R. 459). He concluded that Mr. Outlaw should not interact with the public, but could interact with coworkers and a supervisor (R. 459). Furthermore, Dr. Galassi-Hudspeth found that Mr. Outlaw could perform "at least simple, routine work tasks" and "is able to make ordinary work decisions" (R. 459-60).

During the summer of 2006, Mr. Outlaw was hospitalized due to suicidal ideation and substance abuse, and he was put into a residential substance abuse program (R. 1149-1216). He saw a clinical psychologist and addiction therapist at the VA hospital, and he attended group therapy sessions there. Mr. Outlaw described feeling at times depressed and at times manic, with feelings of helplessness, hopelessness, and suicidal ideation alternated with feelings of increased energy and racing thoughts (R. 1009). On August 1, 2006, he was diagnosed with cocaine and heroin dependence and bipolar disorder (R. 1006-1010).

On March 3, 2007, Mr. Outlaw returned to the VA hospital, and the attending psychiatrist

8

evaluated him and opined that he displayed a depressed mood with a normal affect, fair insight and judgment, intact attention and concentration, and linear thought processes (R. 1279-81). He diagnosed Mr. Outlaw with "cocaine/heroin dependence and substance-induced mood disorder vs. bipolar disorder depressed" (R. 1245). On March 19, 2007, Dr. George Paniotte opined that Mr. Outlaw had poor coping skills, social support, and impulse control; intact concentration and cognition; and fair insight and judgment (R. 1248-49). He diagnosed Mr. Outlaw with cocaine/heroin dependence, depressive disorder, and a provisional diagnosis of bipolar disorder (R. 1249). On May 3, 2007, Dr. Paniotte opined that although Mr. Outlaw "claimed depression" and displayed a "shallow affect," his examination did "not bear this out" (R. 1265).[2]

## B.

At the administrative hearing, held on May 8, 2007, the ALJ reviewed the medical evidence summarized above and heard testimony from Mr. Outlaw and the VE, Cheryl Hoiseth.

### 1.

At the hearing, Mr. Outlaw testified that his last job prior to the onset of his alleged disability was as a maintenance mechanic in 2002 (R. 1648). In that job, he repaired furnace and heating systems and lifted up to 50 pounds occasionally (R. 1648). He held that job for four or five months (R. 1649). The ALJ noted that Mr. Outlaw had a "bunch of jobs" that paid very little money for the four years prior to that (R. 1648). In 1998, Mr. Outlaw worked as a maintenance mechanic for the Chicago Housing Authority (R. 1649). In 1995 and 1997, Mr. Outlaw did warehouse work for a

---

[2] In its response brief, the Commissioner argues that a letter from Dr. Paniotte dated October 18, 2007, after the ALJ's opinion was issued, should not be considered by this Court (Def.'s Mem. at 4 n.4). Mr. Outlaw agrees that we should not consider evidence which was not submitted to the ALJ (doc. # 33, Pl.'s Reply at 1 n.1). We agree as well, and we do not consider the October 18, 2007, letter in this opinion.

9

temporary agency, in which he stood the whole time and lifted between 25 and 50 pounds (R. 1649-50).

Mr. Outlaw testified that he stopped working in December 2002 because his mental state was deteriorating and his back problem was getting worse, such that he could not perform his job functions (R. 1655). He testified that he has several "herniated discs up and own [sp.] his spinal column," fibroid tumors on his feet, carpal tunnel syndrome, and a torn rotator cuff (R. 1651-52). His right rotator cuff was operated on in 1998, and he testified that he cannot lift his arm past shoulder-height or lift more than 10 pounds with that arm (R. 1664). Mr. Outlaw testified that he wears braces at night for his carpal tunnel syndrome (R. 1664-65).

Mr. Outlaw also testified that he wears knee braces for knee problems and that he has used a cane for a year and a half (R. 1652, 1662, 1666). He testified that moving, sitting, and standing aggravates his pain (R. 1669). He takes Oxycontin, Vicodin, and Tramadol for his pain; previously, he was on Vicodin for six months and Tylenol 3 for two and a half years (R. 1667). In addition, he testified that he is bipolar and depressed and manic at times, and takes medication for that which causes drowsiness, lack of concentration, and memory loss (R. 1652, 1661). He used drugs such as heroin to alleviate the pain, but Mr. Outlaw stated that he has been drug-free for the last year (R. 1652, 1656).

He testified that because of his impairments, he cannot cook, clean, do laundry, vacuum, shovel, sweep, go to church, climb a ladder, or write for extended periods of time (R. 1670-71). He testified that some mornings he cannot even get dressed (R. 1671). Mr. Outlaw also has trouble walking for more than 30 feet without excruciating pain (R. 1671). He spends the bulk of his day watching television, but he can only sit for up to one hour at a time before needing to lie down to

recuperate (R. 1666-68).

Before his testimony was over, the VE asked Mr. Outlaw questions to determine the appropriate title for his past work (R. 1675). Mr. Outlaw testified that he received approximately six months of training for the jobs he termed "maintenance mechanic" (R. 1676). At those jobs, he did not fix boilers, but he "bled" and "fired" them, and fixed things such as doors (*id.*).

## 2.

The VE testified next. Based on Mr. Outlaw's testimony, the VE determined that Mr. Outlaw is not a maintenance mechanic or a stationary engineer, but that his past work comes closest to janitorial, or maintenance engineering, which is typically heavy, unskilled work, but was semi-skilled in Mr. Outlaw's case because of his training (R. 1677).

The ALJ asked the VE several hypothetical questions (R. 1678-80). The ALJ first asked the VE to assume a person of Mr. Outlaw's age (forty-nine at the time of the hearing), education (fourteen years), past relevant work as the VE described it, and the following limitations: able to lift ten pounds frequently, twenty pounds occasionally, and sit and stand for six hours out of an eight-hour day (R. 1678). With this hypothetical, the ALJ asked the VE whether such a person could perform Mr. Outlaw's past relevant work, and the VE responded that such a person could not (R. 1678). The ALJ then asked the VE if there were jobs in the simple, light work category for such a person (R. 1678). The VE testified that there were cleaning jobs at the light exertional level (7500 positions), stock clerk jobs at the light exertional level (6100 positions), laundry worker jobs (2100 positions), office clerk jobs (5800 positions), and information clerk jobs (3600 positions) (R. 1678).

Next, the ALJ modified the hypothetical to describe a person who could lift ten pounds frequently and occasionally, stand two hours, sit six hours with a sit/stand option, and be required

11

to occasionally use stairs, stoop, balance, kneel, crouch, and crawl (R. 1679). Based on this hypothetical, the ALJ asked if such a person could do the claimant's past relevant work, and the VE testified that such a person could not (R. 1679). Then, the ALJ asked if there were any jobs for this hypothetical individual (R. 1679). In response, the VE testified that there were, but that the ALJ had now moved into the sedentary group, which means sitting for six hours out of an eight-hour day (R. 1679, 1681). The VE stated that these jobs would include sedentary receptionist (3500 positions), sedentary office clerk (2100 positions), and hand packager (600 positions) (R. 1679).

Lastly, the ALJ asked what jobs were available for a hypothetical person who, in addition to the last set of restrictions, could have no contact with the general public (R. 1679). The VE testified that the hand packager job would remain as well as inspector jobs (400 positions) (R. 1679). The ALJ then confirmed with the VE that his answers were consistent with the Dictionary of Occupational Titles (R. 1680).

## C.

In his written opinion issued on June 27, 2007, the ALJ applied the sequential five-step analysis and found Mr. Outlaw not disabled (R. 12). The ALJ determined that Mr. Outlaw satisfied Step One, because he had not engaged in substantial gainful activity during the period from his alleged onset date of January 1, 2003, to his date of last insured, December 31, 2004 (R. 14). At Step Two, the ALJ determined that Mr. Outlaw had osteoarthritis and allied disorders, personality disorders, and drug dependency, which constituted severe impairments because they significantly limited his physical or mental ability to do work-related activities (R. 15).

At Step Three, the ALJ found that, although Mr. Outlaw had severe impairments at Step Two, the medical evidence did not establish that his impairments met or equaled one of the listed

12

impairments, either singly or in combination (R. 15). Despite Mr. Outlaw's complaints of back pain, herniated disc, knee pain, and carpal tunnel syndrome, the ALJ found that Mr. Outlaw did not meet Listing 1.04 Disorders of the Spine or 1.02 Major Dysfunction of Joint(s) (R. 15). The ALJ found that the objective medical evidence, including the October 2004 VA exams and the findings of an internal medicine doctor, contradicted Mr. Outlaw's subjective complaints of pain (R. 15). The ALJ explained that the medical records showed that Mr. Outlaw could perform fine and gross motor movements with his upper extremities and ambulate effectively (R. 15). In addition, the examining doctors did not find any significant pathology with the back; while there was "some tenderness," doctors repeatedly found only mild or minimal disc or lumbar problems (R. 15).

In addition, the ALJ found that no mental listings were met or medically equaled, including Listing 12.08, Personality Disorders, based on the DDS mental assessment for personality disorder and substance addiction disorder (R. 15). The ALJ found that Mr. Outlaw's mental disorders only called for mild restriction of his activities of daily living and moderate difficulties in maintaining social functioning and concentration (R. 15).

Next, the ALJ found that Mr. Outlaw has the residual functional capacity ("RFC") to perform light unskilled work while avoiding all public contact (R. 15). Specifically, the ALJ found that the claimant could: occasionally lift/carry twenty pounds, frequently lift/carry and push/pull ten pounds; stand, walk and sit for six hours in an eight-hour workday; perform unskilled work with 1, 2, 3 step tasks; and have no contact with the general public on a regular on-going basis (R. 16). In making the RFC determination, the ALJ found that in light of the objective medical evidence, Mr. Outlaw – and his statements regarding intensity, persistence, and the limiting effects of his symptoms – were

13

not entirely credible (R. 17).[3] The ALJ pointed out that Mr. Outlaw alleged an onset date of January 1, 2003, but during his testimony, he stated that his activities of daily living were only limited for two to three years before the 2007 hearing (R. 17). In addition, the ALJ stated that there was a lack of evidence of back/knee pathology and that the medical evidence only indicated mild lumbar pathology (R. 17). Moreover, despite his testimony that he used a cane or walker, the ALJ found that the evidence showed that Mr. Outlaw was ambulatory without the need for a cane or walker, and that he could lift up to twenty pounds (R. 17).

The ALJ opined that Mr. Outlaw's "major problem" continued to be drug abuse, but the ALJ did not find this disabling (R. 17). In addition, the ALJ did not find that any of Mr. Outlaw's stated mental ailments were as serious as Mr. Outlaw described, because Mr. Outlaw's bi-polar disorder was stable with medication, and there was no evidence that the side effects of the medications affected his ability to follow instructions for simple 1, 2, 3 step jobs or tasks (R. 17).[4]

At Step Four, the ALJ found that in light of his RFC, Mr. Outlaw could not perform his past relevant work (R. 18). The ALJ cited the VE's testimony that Mr. Outlaw's past work as a warehouse worker qualified as medium unskilled, and his past work as a maintenance engineer was heavy semi-skilled work (R. 18). At Step Five, the ALJ considered whether Mr. Outlaw could perform other jobs that exist in significant numbers in the national economy (R. 18). Although the

---

[3] In the ALJ's opinion, the heading to his credibility finding states that "the claimant is not credible," while in the body of that section of his opinion, the ALJ uses the words "not entirely credible," specifically, that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible, in light of objective medical evidence and other factors listed above which do not fully support and/or are not consistent with the claimant's subjective complaints" (R. 17).

[4] Some courts use the term "1, 2, 3 step" jobs or tasks to describe a claimant who can follow simple instructions and whose RFC is limited to simple, or unskilled, jobs. *See, e.g., Winfield v. Barnhart*, 269 F. Supp. 2d 995, 1004 (N.D. Ill. 2003); *Collins v. Barnhart*, No. 03 C 3253, 2004 WL 1794911, at *5 (N.D. Ill. Aug. 10 2004).

14

ALJ found that Mr. Outlaw had "no transferable job skills," the VE had testified that a person with a similar age, education, work history, and RFC as Mr. Outlaw could perform various light unskilled jobs consistent with the Dictionary of Occupational Titles, including: cleaning, stock clerk, laundry worker, and office worker (R. 18). Thus, the ALJ concluded that Mr. Outlaw would be able to perform other work that exists in significant numbers in the national economy, and the ALJ found that Mr. Outlaw was "not disabled" under sections 216(I) and 223(d) of the Social Security Act and denied Mr. Outlaw's application for DIB and SSI (R. 19).

## III.

We begin our review of the Commissioner's determination with the governing legal standards. To establish a disability under the Social Security Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Furthermore, a claimant must show that not only do his impairments prevent him from doing his previous work, but also that his impairments prevent him from performing any other "kind of substantial gainful work" that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A).

The social security regulations outline a five-step evaluation process for determining whether a claimant has a disability. 20 C.F.R. § 404.1520(a)(4). These steps, which must be evaluated sequentially, require the ALJ to determine: (1) whether the claimant is currently performing any "substantial gainful activity;" (2) whether the claimant's alleged impairment or combination of impairments is severe; (3) whether the claimant's impairment(s) meet(s) or equal(s) any impairment

15

listed in the appendix to the regulations as severe enough to preclude substantial gainful activity; (4) whether the claimant is unable to perform his or her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4).

A finding of disability requires an affirmative answer at either Step Three or Step Five. 20 C.F.R. § 404.1520(a)(4). A negative finding at any step other than Step Three precludes a finding of disability. *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). The claimant has the burden of proof at every step except Step Five, where it shifts to the Commissioner. *Fischer v. Barnhart*, 309 F. Supp. 2d 1055, 1059 (N.D. Ill. 2004). If the claimant has a severe impairment that does not satisfy a listing at Step Three, the ALJ must determine the claimant's RFC to perform past relevant work. 20 C.F.R. § 404.1520(e). The RFC is used in Step Four to determine whether the claimant can perform his or her past relevant work and in Step Five to determine if the claimant can adjust to other work. 20 C.F.R. §§ 1520(f)-(g). If a claimant's RFC allows him or her to perform jobs that exist in significant numbers in the national economy, then the Commissioner will determine that the claimant is not disabled. 20 C.F.R. § 404.1520(g)(1).

In reviewing the ALJ's decision, the Court may not decide facts anew, reweigh evidence, or substitute its own judgment for that of the ALJ. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Where supported by substantial evidence, the Court must accept the ALJ's findings of fact. 42 U.S.C. § 405(g); *Craft*, 539 F.3d at 673. The substantial evidence standard requires that the ALJ's findings be supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* If conflicting evidence would allow reasonable minds to differ, the responsibility to determine disability belongs to the Commissioner – and the ALJ, by

16

extension – not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Clifford v. Apfel*, 227 F.3d 863, (7th Cir. 2000) (holding that the ALJ, not the courts, resolves evidentiary conflicts). When substantial evidence exists to support the ALJ's decision, it should be affirmed. *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 447 (7th Cir. 2004).

That said, an ALJ is not entitled to unlimited judicial deference. An ALJ must "build an accurate and logical bridge from the evidence to [his or] her conclusion," *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001), and "must confront the evidence that does not support his [or her] conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir., 2004). The ALJ must consider all relevant evidence, and may not choose to disregard certain evidence or discuss only the evidence that favors his or her decision. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). In addition, the ALJ must articulate the reasons he or she rejected certain evidence so that the reviewing court can ultimately assess whether the determination was supported by substantial evidence. *Id.* at 677-78; *see also Craft*, 539 F.3d at 673.

## IV.

Mr. Outlaw makes three arguments in support of his motion for summary reversal and/or remand: (1) that the ALJ's RFC assessment was contrary to Social Security Ruling ("SSR") 96-8p; (2) that the ALJ's Step Five determination was in error because the ALJ either misinterpreted the VE's testimony or independently determined what jobs Mr. Outlaw could perform with his RFC; and (3) that the ALJ's credibility determination was contrary to SSR 96-7p. We address the ALJ's credibility determination together with his RFC determination because the RFC finding was in large part based on the credibility finding.

17

## A.

Mr. Outlaw contends that in making his RFC determination, the ALJ ignored Mr. Outlaw's limited ability to sit and walk as well as other medically documented impairments, including lumbar sacral radiculopathy, degenerative joint disease, carpal tunnel syndrome, plantar fibromatosis, adjustment disorder with mixed anxiety and depressed mood, depression, bipolar disorder, paranoid traits, borderline traits, schizoid traits, and obesity (Pl.'s Mem. at 10). As explained above, the ALJ found that Mr. Outlaw has the RFC to perform light unskilled work including the limitations of lifting/carrying twenty pounds occasionally and ten pounds frequently; stand, walk, and sit for at least six hours in an eight-hour day; perform 1, 2, 3 step tasks; and have no contact with the general public (R. 15-16). The RFC is the "maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675-76. In making the RFC determination, the ALJ must look at the medical evidence and other evidence in the record, such as the claimant's testimony at the administrative hearing. *Id.* at 676. The ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered "severe." *Id.*

Contrary to Mr. Outlaw's arguments, the ALJ's written opinion demonstrates that he considered Mr. Outlaw's testimony and subjective complaints of pain in making his RFC determination. In his opinion, the ALJ stated that Mr. Outlaw "said he could not work due to degenerative disc disease, herniated disc, fibro tumor of fat, carpal tunnel syndrome, torn rotator cuff, bilateral knees, bipolar disorder, depression and drug addiction" (R. 14). In addition, the ALJ noted that Mr. Outlaw testified that "he has been using a walker for several weeks due to edema, a cane since 6/04, RTC [rotator cuff] surgery made his condition worse; and he used wrist braces, but admitted he could lift at least 10 pounds on the right shoulder[-]high" (R. 17).

18

The ALJ determined, however, that the objective medical evidence showed otherwise. The ALJ cited to various medical records from the VA Hospital and to the reports of Dr. Stronska, Dr. Towfiq, and Dr. Galassi-Hudspeth, which found that the MRIs, straight leg tests, and other objective medical evidence did not support Mr. Outlaw's complaints of excessive pain. Based on conflicts between Mr. Outlaw's testimony and the medical evidence in the record, the ALJ determined that Mr. Outlaw's complaints and stated limitations were not entirely credible (R. 17). We review an ALJ's credibility determination with great deference because the ALJ is in a better position than a reviewing court to evaluate credibility, and we will reverse only if the ALJ's determination is "patently wrong." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). "[A]lthough an ALJ may not simply disregard a claimant's subjective complaints of pain, he may view discrepancies with the medical record as probative of exaggeration." *Knox v. Astrue*, No. 08-3389, 2009 WL 1747901, at *3 (7th Cir. June 19, 2009). If an ALJ finds that a claimant lacks credibility, he may disregard – or discount – a claimant's assertions. *Simila*, 573 F.3d at 517; *see also Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("[a]n ALJ may disregard a claimant's assertions of pain if he validly finds her incredible").

Here, a review of the record shows that the ALJ was not "patently wrong." Contrary to Mr. Outlaw's arguments, the ALJ does not rely on a "lack of objective evidence" in rejecting some of Mr. Outlaw's statements as to his symptoms and ability to work, but rather on the abundance of medical evidence that contradicts many of Mr. Outlaw's subjective complaints, including the factors set forth in SSR 96-7p, such as the objective medical evidence and statements and information provided by examining physicians and psychologists about the alleged symptoms and how they affect Mr. Outlaw. For example, Mr. Outlaw testified that he had trouble dressing, sitting, and

performing simple physical activities (R. 1669-72); however, during an internal medicine consultative examination, which the ALJ referenced, Mr. Outlaw was observed bending, dressing, undressing, getting up from a chair, and getting on and off "the exam table without difficulty" (R. 15, 475). Furthermore, Mr. Outlaw "was able to walk without assistance as well as to squat/arise from squatting position and heel/toe/tandem walk without difficulty" (R. 475). During the examination, Mr. Outlaw was also found to have a "full range of motion of all major weight-bearing joints and the spine" as well as the "ability for fine and gross manipulations" (R. 475). In addition, the ALJ determined, as did several of Mr. Outlaw's attending medical personnel, that many of his physical and mental problems stem from his ongoing problem of drug abuse. Further, Mr. Outlaw's credibility was called into question because he claimed to have stopped using drugs a year before his hearing, but his medical records indicate that he tested positive for drugs only four months before his hearing (R. 1293, 1660). Additional examinations from the VA hospital support these objective medical findings, and, by extension, the ALJ's finding that Mr. Outlaw lacks credibility. *Cf. Phillips v. Massanari*, No. 00 C 3939, 2001 WL 936120, at *9 (N.D. Ill. Aug. 16, 2001) (holding that the ALJ's credibility evaluation was entitled to deference because there was no objective medical evidence in the record to contradict his determination where the claimant failed to submit any objective medical evidence to show that he was disabled due to pain).

Mr. Outlaw contends that despite the ALJ's consideration of some of his subjective medical complaints and limitations, the resulting RFC shows that the ALJ "failed to account for hundreds of pages of medical evidence" (Pl.'s Reply at 8). The ALJ, however, was not required to account for all or even most of the 1600-plus pages of the administrative record in this case. "The ALJ is not required to mention every piece of evidence but must provide an accurate and logical bridge between

the evidence and the conclusion that the claimant is not disabled, so that as a reviewing court, we may assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review." *Craft*, 539 F.3d at 673 (internal quotations omitted).

Mr. Outlaw argues that the ALJ did not provide the accurate and logical bridge between the evidence and his conclusions, because the RFC is not compatible with Mr. Outlaw's testimony that he could only lift ten pounds with his right arm past shoulder height and only walk for thirty feet and sit for forty-five minutes at a time (Pl.'s Mem. at 11-12). Contrary to Mr. Outlaw's arguments, his RFC is compatible with the objective medical evidence cited to by the ALJ: medical records from the VA hospital and to the reports of Dr. Stronska, Dr. Towfiq, and Dr. Galassi-Hudspeth, which found that the MRIs, straight leg tests, and other objective medical evidence that Mr. Outlaw was ambulatory and not using a cane or walker did not support his complaints of excessive pain (R. 17).[5] "The ALJ. . . is not only allowed to, but indeed must, weigh the evidence and make appropriate inferences from the record." *Seamon v. Astrue*, 08-4298, 2010 WL 323515, at \*3 (7th Cir. Jan. 29, 2010). In *Knox*, as here, the ALJ acknowledged the claimant's description of his back pain and limitations but found that the medical evidence suggested he had exaggerated his limitations. *Knox*, 2009 WL 1747901, at \*3.

Mr. Outlaw visited the VA hospital many times complaining of back and other pain, and the medical professionals repeatedly attempted to diagnose Mr. Outlaw's symptoms. However, the tests they conducted to determine the cause of Mr. Outlaw's pain repeatedly came back negative. In

---

[5] Mr. Outlaw also argues that the testimony of a medical expert was required before the ALJ could dismiss his physical impairments as non-severe (Pl.'s Reply at 4-5, 7). This argument misstates the law. In *Bailey v. Barnhart*, this Court held that an independent medical advisor should be called before determining a claimant's RFC if the ALJ rejects the available medical record. 473 F. Supp. 2d 822, 830 (N.D. Ill. 2006). The ALJ here, however, did not reject the medical record.

addition, the medical professionals observed that Mr. Outlaw was able to sit, stand, walk, squat, and complete other activities that did not indicate that Mr. Outlaw's alleged pain was hindering his physical activities to the extent he claimed.[6] It is sufficient that the ALJ pointed to the objective medical evidence in the record, including the medical reports that determined that Mr. Outlaw's impairments were non-severe, to build the "accurate and logical bridge" to the ALJ's findings. *See Craft*, 539 F.3d at 673.

Mr. Outlaw also argues that the ALJ failed to analyze the impact of Mr. Outlaw's obesity on his combination of impairments (Pl.'s Reply at 5-6). The ALJ noted that Mr. Outlaw was 5'8" tall and 256 pounds, but did not specifically address Mr. Outlaw's obesity (R. 14). Nevertheless, in coming to his final decision, the ALJ relied on the opinions of physicians who had considered Mr. Outlaw's weight in their diagnoses and medical recommendations. Therefore, the ALJ's failure to discuss the impact of Mr. Outlaw's obesity was harmless error. *See Prochaska v. Barnhart*, 454 F.3d 731, 736-38 (7th Cir. 2006) (ALJ's failure to discuss the impact of claimant's obesity was harmless error so long as ALJ demonstrated that he reviewed the medical reports of the doctors familiar with the claimant's obesity); *Skarbeck v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

As the ALJ's determination of Mr. Outlaw's RFC is supported by substantial evidence, this Court declines to reverse or remand the ALJ's determination of Mr. Outlaw's RFC. *Flener*, 361 F.3d at 447.

---

[6] Further, the Court notes that despite Mr. Outlaw's testimony that he could not lift more than ten pounds on his right shoulder since his rotator cuff surgery in 1998 (R. 1664), Mr. Outlaw also testified that in 2002, he held a job for four to five months where he repaired the furnace and heating systems and lifted up to fifty pounds occasionally (R. 1648-49).

**B.**

Mr. Outlaw also argues that the ALJ erred in his Step Five determination. At this step, the ALJ found that there were significant numbers of jobs in the national economy for a person with the age, education, work experience, and RFC of Mr. Outlaw (R. 18). Based on Mr. Outlaw's RFC and the VE's testimony, the ALJ determined that Mr. Outlaw could perform the following jobs, which have the following number of jobs available: "cleaning jobs, 7,500 jobs; stock clerk, 6,100 jobs; laundry worker, 2,100 jobs; and office worker, 5,800 jobs" (R. 19).

The VE had testified that these jobs were available in the economy for a person who could perform simple, light work (R. 1678). "To perform the full range of light work, a claimant must be able to stand or walk, off and on, for a total of approximately 6 hours of an 8-hour workday, lift up to 20 pounds, and frequently lift or carry objects weighing up to 10 pounds." *Zatz v. Astrue*, 08-4175, 2009 WL 3198743, at *4 (7th Cir. Oct. 5, 2009) (citing 20 C.F.R. § 416.967; SSR 83-10). As explained above, the ALJ's determination that Mr. Outlaw could perform light, simple work was supported by substantial evidence. However, in determining which jobs were available for Mr. Outlaw in the national economy, the ALJ failed to include the restriction in Mr. Outlaw's RFC that he have no contact with the general public (R. 16).

The Court must determine whether this error was harmless or whether it requires remand. It is harmless error "[i]f the outcome of a remand is foreordained," and in such a situation, remand is not required. *Sahara Coal Co. v. Office of Workers' Compensation Programs*, 946 F.2d 554, 558 (7th Cir. 1991). At Step Five, the ALJ's misinterpretation of the VE's testimony is harmless error if Mr. Outlaw's properly determined RFC nevertheless allows him to perform jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520(g)(1).

23

Here, the VE did not testify as to the number of jobs available for a hypothetical person who could perform simple 1,2,3 step tasks and light work but have no contact with the general public. Rather, the ALJ asked the VE which jobs were available for a hypothetical person who could perform sedentary work, but have no contact with the general public (R. 1679). For that hypothetical person (who could only lift ten pounds frequently and ten pounds occasionally, stand for two hours and sit/stand for six hours in an eight-hour workday with occasional stairs, stooping, balancing, kneeling, crouching, crawling, and no ladders), the VE testified that the jobs available were hand packager (for which about 600 jobs are available) or inspector (for which 400 jobs are available) (R. 1679).

Even if these 1,000 sedentary, no public contact jobs were all that was available to Mr. Outlaw, that is a significant number of jobs available in the national economy; thus, a finding of not disabled would be appropriate. In *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993), the Seventh Circuit held that 1,400 jobs was a significant number, and the Court listed cases in other circuits where as few as 500 jobs were significant. However, we need not debate here whether 1,000 jobs is a significant number, because more than 1,000 jobs are available to Mr. Outlaw in the national economy. One thousand jobs were available for a hypothetical person with a more restrictive RFC than Mr. Outlaw: a sedentary person who could perform simple 1, 2, 3 step tasks but have no contact with the public. By contrast, Mr. Outlaw's RFC included fewer restrictions because the ALJ found that he could perform light work, a broader category than sedentary work. Thus, the number of jobs available for Mr. Outlaw in the national economy lies somewhere between 1,000, and the 21,500 jobs available to someone who can perform simple, light work, who is not limited in their contact with the public. The ALJ's error here was therefore harmless because a significant number of jobs

24

cited by the ALJ and the VE remained available to Mr. Outlaw. *See Coleman v. Astrue*, No. 07-1729, 2008 WL 695045, at *5 (7th Cir. Mar. 14, 2008) (harmless error where significant number of jobs cited by the ALJ and not inconsistent with the DOT remained available to claimant).

## CONCLUSION

For the foregoing reasons, we deny Mr. Outlaw's motion for summary judgment (doc. #221), and we grant the Commissioner's motion for summary judgment (doc. # 31).


ENTER:


**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: February 25, 2010**